# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 1, 2015


## STATE OF TENNESSEE v. ANTONIO M. CROCKETT


**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-2862     Cheryl A. Blackburn, Judge**

_____


**No. M2015-00566-CCA-R3-CD – Filed February 29, 2016**

_____


A Davidson County jury found the Defendant, Antonio M. Crockett, guilty of first degree felony murder, for which the Defendant received a life sentence.  On appeal from his conviction, the Defendant contends that (1) the trial court erred in denying the Defendant's motion to sever his case from that of his co-defendant; (2) the evidence was insufficient to support his conviction; (3) the trial court erred in admitting the statement of the victim under the dying declaration hearsay exception; and (4) the trial court erred in ordering the Defendant's life sentence to be served consecutively to a prior sentence. Upon review, we affirm the judgment of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

C. Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), J. Michael Engle (at trial) and Kristin Neff (at trial), Assistant District Public Defenders, Nashville, Tennessee, for the appellant, Antonio M. Crockett.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Glenn Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Pretrial*

In October 2013, the Davidson County Grand Jury indicted the Defendant and his co-defendant, Raymond Douglas Wilson, III, for first degree felony murder in perpetration of or attempt to perpetrate theft and first degree premeditated murder in the death of Derrick Lyons. The Defendant filed a motion to sever defendants in February 2014. In the motion, the Defendant asserted that both he and co-defendant Wilson made pretrial statements to law enforcement officers implicating one another in some aspect of the offense, and he argued that to admit co-defendant Wilson's statement in a joint trial would violate the Defendant's "right to confront the speaker of these statements." At a hearing on the motion, the State announced that it did not intend to admit any statement from co-defendant Wilson that would incriminate the Defendant at trial. Moreover, while the State intended to introduce some of the Defendant's statements, it would not seek to introduce any statement of the Defendant that referenced co-defendant Wilson. Following this announcement, counsel for the Defendant stated that the State's response "satisfied" the Defendant's motion.

On June 30, 2014, the Defendant filed a second motion to sever defendants on the basis of his right to a speedy trial. The Defendant alleged that he had been in custody since his arrest for the victim's murder on July 18, 2012, and asserted that "two indictments [had] been nolled since that time." He argued that he had not waived his right to a speedy trial and that the State's recent request for fingerprints[1] and testing of DNA evidence created "the obvious prospect of new last-minute evidence and expert testimony" and a need to continue the Defendant's trial, which was scheduled to begin July 28, 2014. The Defendant additionally argued that a severance was necessary because there was a disparity in the proof against the defendants; the defendants' knowledge of each other's statements caused "mutual animosity and resentment," necessitating extra courtroom security; and it was possible that one of the defendants' out-of-court statements led to the discovery of incriminating evidence against the other.

The State responded that the Defendant's motion should be denied because there was no legal basis for a severance and argued that the defendants be tried together for the sake of judicial economy. Additionally, the State noted that the Defendant was in jail

---

[1] Following the first motion to sever defendants, the State filed a motion requesting that the defendants submit to new fingerprinting, which the trial court granted on June 25, 2014.

serving a sentence until 2017 and that the Defendant had several other pending cases. The State further contended that the DNA evidence could implicate the Defendant because the victim's car was driven away from the scene by co-defendant Wilson but found near the Defendant's mother's house. The victim's car had been "gone through," and the State's theory was that the Defendant was "one of the ones who went through that car." The State conceded that its failure to have the DNA evidence tested sooner was "an oversight" and that "[i]t should have been done earlier."

The trial court noted that it had been made aware, at a hearing on June 27, 2014, of the existence of possible trace evidence which might contain identifiable DNA.[2] The court explained that, although co-defendant Wilson had not opposed a continuance in order for the State to conduct DNA testing, the Defendant had objected to the continuance, asserting that the testing would take months to complete. When the trial court asked whether the redacting of the Defendant's statement would prevent the Defendant from introducing proof necessary for a fair trial, defense counsel responded, "I don't foresee that at the moment." As to the speedy trial issue, defense counsel stated that the Defendant would have no problem with securing witnesses or presenting defense proof because of the delay of the start of trial. Defense counsel agreed that the basis of his allegation of prejudice was the additional time the Defendant could spend in confinement given the time he had already spent in custody. The trial court also asked the Defendant about the potential for ordering a severance during trial based upon proof arising that necessitated it. The Defendant stated that the trial court could do so if needed but indicated that he "would sort of like to not be at that point."

Following the hearing, the trial court filed a written order denying the motion to sever and granting the State's request for a continuance of the Defendant's trial. The trial court determined that there was no Bruton[3] issue because the State agreed not to use either co-defendants' statements at trial. The trial court found that the animosity between the two defendants was an insufficient reason to grant a severance. Additionally, the trial court determined that the pending DNA testing was a proper basis for a continuance and that considerations of judicial economy weighed in favor of a joint trial. Finally, the trial court found that the Defendant was not prejudiced by the delay and noted that the reason for the Defendant's incarceration was that the Defendant was serving another sentence and had multiple cases pending before the court.

---

[2] A transcript of the June 27 hearing is not part of the record on appeal.

[3] See Bruton v. United States, 391 U.S. 123 (1968).

- 3 -

The case went to trial in January 2015. Jenenia Keeler[4] testified that the victim, Derrick Lyons, was her fiancé. On June 30, 2012, Ms. Keeler and the victim planned to go swimming. She needed her swimming suit at her mother's house. The victim dropped off Ms. Keeler at her mother's house on Charles E. Davis Boulevard ("Davis Boulevard") so that Ms. Keeler could get ready, and the victim left to fill up his green BMW SUV with gas. When he returned, the victim called Ms. Keeler and said that he was ready to go. As Ms. Keeler walked to the front door, her sister opened the door and said that someone had just shot the victim. Ms. Keeler ran outside and saw the victim "squeezing out" of the driver's door of his car. Ms. Keeler testified the victim was parked on the right side of the street and that there was another car parked "[r]ight beside the driver's door," blocking the victim inside his car. Ms. Keeler could not see who was driving this other car and could not recall what the car looked like. The victim ran across the street toward Ms. Keeler. As he crossed the street, Ms. Keeler noticed a red spot on the right side of his shirt. Ms. Keeler screamed for the victim to stop running and made him lie down. She testified about her time with the victim from that point:

> And I pretty much just told him I loved him, that it was okay, that he was going to be okay, that he was going to be okay. And we talked. We talked. And it was so hot out there. It was like—it was so hot. And I asked could somebody help me because they—I just—I stayed there by him. I stayed by his side. I was looking for some help, and I couldn't get it. I couldn't get it. The ambulance it seemed like it took forever to get there.

When asked what the victim said to her, Ms. Keeler testified, "He said he loved me back." Ms. Keeler recalled that someone handed her towels to apply to the victim, and she identified photographs of the bloody towels and the victim's bloody shirt. She stated that she rode in the front seat of the ambulance as they transported the victim to the hospital. Ms. Keeler spoke to detectives upon arrival at the hospital and then learned that the victim had not survived. Ms. Keeler stated that the victim had been known to carry cash.

Kathy Patterson, Ms. Keeler's sister, testified that she was on her mother's front porch when she heard a gunshot. She looked across the street to where the victim had been sitting in his car waiting for Ms. Keeler and saw the victim getting out of his car. Ms. Patterson testified that the victim's car was parked close to the curb and that it was "hemmed in" by a black car which was facing in the same direction as the victim's.

---

[4] In this opinion, we will refer to Jenenia Keeler as "Ms. Keeler" and her mother, Cleo Keeler, as "Mrs. Keeler."

Because of the black car, the victim was unable to pull away from the curb and he had to struggle to get out of his car door because he was pinned in. Ms. Patterson recalled that the victim had to "squeeze" out of his car door. Ms. Patterson could not see anyone inside the black car. However, Ms. Patterson stated that she had seen the Defendant, whom she knew as "Bull," driving the black car three or four times in the month leading up to the shooting.

Ms. Patterson testified that as the victim ran from his SUV, she noticed a red spot on his white shirt. Ms. Patterson stepped inside the front door of her mother's house and said that the victim had just been shot. The victim collapsed before making it to the house. He was "in a lot of pain, and he was groaning." The victim also had blood "pouring out" of him, and he was sweating heavily. Ms. Patterson testified that the scene quickly became chaotic as her mother called 911 and neighbors began tending to the victim. She recalled Robert Rooks kneeling over the victim and speaking to him at one point.

Robert Rooks testified that the victim was his cousin. Mr. Rooks recalled that, on the day of the shooting, he was walking through an alley towards Davis Boulevard when he heard a gunshot. Then, a man ran into the alley and told Mr. Rooks that the victim had just been shot and robbed. As he ran towards the crime scene, Mr. Rooks saw the victim's SUV turn right onto Green Street. He then heard "hollering and screaming" and saw the victim lying on the ground across the street. Mr. Rooks ran to the victim and rolled him onto his side. The victim was bleeding heavily, sweating, and appeared to be in pain. Mr. Rooks testified that he was the first person to make it to the victim and he stayed with the victim until the paramedics arrived. As they waited, the victim told Mr. Rooks several times, "Bull blocked me in." Mr. Rooks testified that he had known the Defendant for at least ten years and that the Defendant went by the nickname "Bull."

Cleo Keeler testified that she and Ms. Patterson had arrived at their home on Davis Boulevard shortly before the shooting. Mrs. Keeler and Ms. Patterson had been to the store, and the victim had offered to help carry their groceries inside. The victim then went back to his vehicle, which was parked across the street. Mrs. Keeler was sitting in her living room when she heard a gunshot. Ms. Patterson then came to the door and said that the victim "just got shot." Mrs. Keeler called 911 as she ran outside to the victim who was already down on the ground. Mrs. Keeler noticed a black car sitting alongside the victim's SUV, toward the front of the SUV at the driver's door. Although Mrs. Keeler did not see who was inside the black car, she testified that she had seen the black car before and knew that the Defendant drove the car. While on the phone with the 911 dispatcher, Mrs. Keeler saw a man that she did not know get into the driver's seat of the victim's SUV. Thereafter, the black car pulled off, and the man driving the victim's SUV

followed the black car. Mrs. Keeler recalled that people from her neighborhood, including Mr. Rooks, began gathering around the victim.

Laquitta Waters testified that she was driving in the area at the time of the shooting. Ms. Waters said that she had pulled up to a stop sign at the intersection of Davis Boulevard and Fain Street when she heard "a big boom." When Ms. Waters looked in the direction of the gunshot, she saw co-defendant Wilson standing by the front passenger-side door of the victim's SUV with a gun in his hand. The victim got out of the driver's seat and ran from the SUV. Co-defendant Wilson then went around the front of the SUV and got into the driver's seat. Ms. Waters testified that an Altima was pulled up beside the victim's SUV and had the victim's car "blocked in." The Altima then "pulled off," and co-defendant Wilson followed the Altima onto Green Street in the victim's SUV. Ms. Waters stated that she could not see the driver of the Altima but she saw the Defendant in the same vehicle two days before the shooting. Ms. Waters parked her car and crossed the street to where the victim was lying. She recalled that Mr. Rooks was talking to the victim and that the victim was fading "in and out." She heard Mr. Rooks ask the victim, "[D]o you know who done [sic] this?" Ms. Waters also recalled seeing Antonio Anthony at the scene following the shooting.

Antonio Anthony, a close friend of the victim, testified that he was walking up the sidewalk on Davis Boulevard when he saw the Defendant, whom he had known for a long time, driving a black Nissan Altima down the street. The Defendant made a U-turn at Fain Street, and a man, later identified as co-defendant Wilson, got out of the back passenger side of the car. Mr. Anthony testified that, after co-defendant Wilson got out of the Defendant's car, the Defendant pulled up to the victim's SUV and "blocked him in[.]" Mr. Anthony stated that the Defendant parked his car in such a way that there was no place for the victim to go and that the victim could not drive his car away. As Mr. Anthony continued walking, he noticed that co-defendant Wilson had a gun. When co-defendant Wilson got to the victim's SUV, he hit one of the victim's windows with the gun and ordered the victim to open the car door. Mr. Anthony testified that the victim "tried to pull off" and then he heard a gunshot. He saw the victim jump out of his car and run across the street and co-defendant Wilson get into the driver's seat of the victim's SUV. Then, co-defendant Wilson and the Defendant fled the area, driving in the same direction down Green Street.

Laquinta Kirk testified that she was the Defendant's girlfriend at the time of the offense and that his nickname was "Bull." Ms. Kirk stated that, at the time of the murder, she was at her sister's home in East Nashville and learned about the murder from a text message and phone calls from the Defendant's sister. After the shooting, the Defendant picked up Ms. Kirk in his black Nissan Altima. Ms. Kirk testified that, when she got into the car, the Defendant began wiping down the inside of the car, including the area in the

front seats and middle console. After picking up Ms. Kirk, the Defendant drove to a parking lot in East Nashville where he met with detectives to discuss the shooting and "clear his name." Ms. Kirk stated that the Defendant got into a car with detectives while she waited in the Defendant's car.

Officer Jeremy Smith, with the Metro-Nashville Police Department (MNPD), testified that he interviewed Ms. Keeler and Mr. Rooks at the hospital and then returned to the crime scene. Once there, he was approached by a witness who had located the victim's SUV in an alley behind a house on Donelson Street. Officer Smith went to the car and noted that someone had rummaged through the vehicle and that the back right passenger window had been shattered. Officer Smith called for an identification officer to come to the scene, and they towed the victim's SUV to a secure location. On cross-examination, Officer Smith stated that Mr. Rooks did not tell him the victim said, "Bull blocked me in."

Officer Kenneth Wolfe testified that he worked as a crime scene technician in the identification unit of MNPD. Along with another crime scene technician, Officer Wolfe responded to Davis Boulevard where he found shattered glass on the roadway and a cartridge casing. About forty-five minutes later, Officer Wolfe was called to a second scene less than a quarter of a mile away. At the second location, he found the victim's BMW SUV behind a house. Officer Wolfe noted that the back passenger-side window was shattered and that there was a "defect" in the headrest of the front passenger seat. Additionally, the inside of the vehicle had been "ransacked." Someone had gone through the center console, and a CD was lying on the ground outside the vehicle. Officer Wolfe had the vehicle towed to a secure location for processing.

Dr. Erin Carney, an expert in forensic pathology, testified that Dr. Amy Hawes had performed the victim's autopsy but that Dr. Hawes had since moved to another jurisdiction. Dr. Carney reviewed the case, including Dr. Hawes' autopsy report, photographs of the victim, the victim's medical records, and the police incident reports, and testified that she agreed with Dr. Hawes' findings. Specifically, Dr. Carney stated that the victim died as a result of a gunshot wound to the torso and that the manner of death was homicide. She explained that the bullet had passed through the victim's diaphragm, liver, pancreas, stomach, and descending colon before lodging in the victim's abdomen. She further stated that the victim had 750 milliliters of blood in his abdomen from the various injuries to his organs.

Detective Johnny Crumby testified that he arrived at the scene of the shooting around 1:15 p.m. after the victim had been transported to the hospital. After putting out an alert on the victim's stolen SUV, it was found in an alley between Donelson Street and Fain Street—about two or three blocks from the site of the shooting. After viewing the

victim's "ransacked" car, Detective Crumby received a call from Elaine Crockett, the Defendant's mother. Ms. Crockett stated that she and the Defendant had been threatened because of the Defendant's alleged involvement in the victim's murder. Detective Crumby went to Ms. Crockett's home on Fain Street, in the neighborhood of the shooting. Detective Crumby estimated that the Defendant's mother's house was about one minute on foot from the victim's abandoned vehicle. Ms. Crocket confirmed that the Defendant's nickname was "Bull."

A few hours later, Detective Crumby met with the Defendant in a local parking lot. The Defendant arrived in the black Nissan Altima that had been involved in the incident. He gave a recorded statement to Detective Crumby in which the Defendant acknowledged being in his car at the scene of the shooting and driving away thereafter. However, the Defendant denied having any role in the shooting or theft of the victim's car. The Defendant claimed that he had been parked in the street calling a girl when he heard a gunshot. The Defendant stated that the victim's vehicle collided with his car and that the victim then got out of the victim's car and ran. The Defendant pointed out damage to his car caused by the collision. The Defendant insisted that he did not see the shooter and that he drove away after the collision because he was scared. He stated that he saw the victim's vehicle drive away as well. The Defendant stated, "I ain't trying to block nobody in," and he maintained that the damage to his own vehicle supported his claim. When Detective Crumby told the Defendant that witnesses said a man got out of the Defendant's car and shot the victim, the Defendant denied this. Detective Crumby asked the Defendant if his phone would show a call placed to the girl he claimed to have been calling at the time of the shooting, and the Defendant replied that it would. However, when Detective Crumby reviewed the call history on the Defendant's cell phone, there were no calls placed during the time immediately before or after the shooting.

Based upon this testimony, the jury found the Defendant guilty of first degree felony murder and not guilty of first degree premeditated murder.[5] The trial court imposed an automatic life sentence and scheduled a sentencing hearing to determine whether the sentence would be served concurrently or consecutively to the Defendant's sentence in a prior case.

At the subsequent sentencing hearing, the State introduced a copy of the Defendant's presentence report and called Michael Davis, an internal affairs investigator at the CCA Metro-Davidson County Detention Facility ("CCA"). Mr. Davis testified that he was at work on May 5, 2014, when he became involved in an investigation regarding the Defendant, who was an inmate at CCA. On that day, the Defendant used homemade

---

[5] The jury found co-defendant Wilson not guilty on all charges.

weapons—specifically a "lock in a sock and improvised mace"—to attack another inmate, Mack Lloyd. Mr. Davis explained that the Defendant, who had been in an ongoing argument with Mr. Lloyd, approached Mr. Lloyd from behind while Mr. Lloyd was lying in bed. The Defendant "smashed" Mr. Lloyd in the face with the lock in the sock, breaking Mr. Lloyd's jaw. The Defendant then chased Mr. Lloyd around the bunk beds before officers responded and evacuated Mr. Lloyd to the medical facility. Mr. Lloyd was taken to an outside hospital where he had to have his jaw wired shut. Mr. Davis testified that, following the violent assault, the Defendant had to be placed in administrative segregation for "a good while[.]" He stated that the assault was captured on video, and the State introduced a copy of the video as evidence.

At the conclusion of proof, the trial court found that the Defendant was an offender whose criminal activity was extensive. The trial court noted that the Defendant had "six or seven prior felony convictions and seventy prior misdemeanor convictions." In reviewing the presentence report, the trial court found that the Defendant's prior convictions included evading arrest with risk of death, robbery, aggravated assault, and aggravated burglary. The trial court additionally found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that the Defendant had no hesitation about committing a crime when the risk to human life was high. The trial court considered the facts of the instant case and that the Defendant had broken another inmate's jaw while in custody awaiting trial in the instant case. The trial court then considered whether "the aggregate term reasonably relates to the severity of the offenses." The trial court stated, "Somebody lost their life and somebody else while he's incarcerated is injured severely. So I think it is necessary to protect the public from further serious criminal conduct by the [D]efendant given the facts of this case as well as that." Based upon these considerations, the trial court ordered the Defendant's life sentence to run consecutively to his six-year sentence in case number 2012-D-2860.[6] Thereafter, the Defendant filed a timely motion for new trial, which the trial court denied. This timely appeal followed.

## II. Analysis

On appeal from his conviction, the Defendant contends that (1) the trial court erred in denying the Defendant's motion to sever his case from that of his co-defendant; (2) the evidence was insufficient to support his conviction for first degree felony murder; (3) the trial court erred in admitting the statement of the victim under the dying declaration

---

[6] It appears from the record that the Defendant committed the offense in case number 2012-D-2860 on February 22, 2012, and was issued a citation in lieu of arrest. In January 2014, the Defendant pleaded guilty to a felony drug offense in the case and received a sentence of six years.

exception to the hearsay rule; and (4) the trial court erred in ordering the Defendant's life sentence to be served consecutively to a prior sentence.

## A. Motion to Sever Defendants

The Defendant first asserts that the trial court erred in denying his motion to sever defendants. He argues that the severance of his case from that of his co-defendant was required under Tennessee Rule of Criminal Procedure 14(c)(2)(A) because separate trials were necessary to protect his constitutional right to a speedy trial. He also contends that the trial court should have ordered a severance when the State decided, during trial, to seek admission of only that portion of the victim's dying declaration that implicated the Defendant. The Defendant argues that, at that time, a severance was necessary to achieve a fair determination of the Defendant's guilt or innocence under Tennessee Rule of Criminal Procedure 14(c)(2)(B). The State responds that the trial court acted within its discretion in denying the Defendant's motion to sever defendants. We agree with the State.

Tennessee Rule of Criminal Procedure 8(c)(1) provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each of the defendants is charged with accountability for each offense included[.]" Tenn. R. Crim. P. 8(c)(1). According to Tennessee Rule of Criminal Procedure 14, a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). A trial court may grant a severance of defendants during the trial if, "with consent of the defendants to be severed, the court finds a severance necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(B).

The decision to grant or deny a motion for severance of defendants rests within the sound discretion of the trial court, and we will not disturb the trial court's ruling absent clear abuse of that discretion. State v. Dotson, 254 S.W.3d 378, 390 (Tenn. 2008). "Where a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[.]" State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000). The record must demonstrate that "the granting of a severance became a judicial duty" before an accused is entitled to a reversal of his conviction. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988) (quoting Hunter v. State, 440 S.W.2d 1, 6 (Tenn. 1969)).

# 1. Speedy Trial

The Defendant contends that severance was required pretrial under Rule 14(c)(2)(A) because separate trials were necessary to protect the Defendant's right to a speedy trial. He asserts that he suffered prejudice caused by the delay in this trial "due to his co-defendant's ability to create further delay through the State's negligence, and his loss of the opportunity to receive a concurrent sentence."

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. Art. I § 9. Tennessee also has a statutory right to a speedy trial. See Tenn. Code Ann. § 40-14-101. However, the right to a speedy trial does not arise until the defendant has been arrested or an indictment has been issued. State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). If the defendant's right to a speedy trial was violated, the only remedy is to dismiss the charges against him. Barker v. Wingo, 407 U.S. 514, 522 (1972); State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973).

In Barker v. Wingo, the United States Supreme Court established four factors to be considered when determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. Barker, 407 U.S. at 530. Additionally, the Tennessee Supreme Court has stated that the strength of the State's case as to guilt can be used to help judge the four Barker factors. Bishop, 439 S.W.2d at 85.

A delay approaching one year will trigger a speedy trial analysis, and the presumption that delay has prejudiced the defendant intensifies over time. Doggett v. United States, 505 U.S. 647, 652 (1992); State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997). However, courts take into account the complexity of the case in evaluating the reasonableness of the length of delay. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). Further, there may be reasons that justify delay, with different reasons assigned different weight in the balancing analysis. Barker, 407 U.S. at 531. Intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant is weighed heavily against the State. Id. Bureaucratic indifference or negligence is also weighed against the State, although not as heavily as deliberate delay. Id. Finally, Barker listed three areas in which a defendant could suffer prejudice due to a delay: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) impairment of the defense. Id. at 532. Of the three, impairment of the defense is the most serious way in which a defendant can be prejudiced. Id.

### a. Length of Delay

In this case, the length of the delay from arrest was approximately twenty-nine months. The record shows that the Defendant was arrested for this offense on July 18, 2012, and the Defendant's trial did not begin until January 5, 2015. Such delay is sufficient to trigger a speedy trial analysis. See Utley, 956 S.W.2d at 494.

### b. Reason for the Delay

The Defendant's case involved charges of first degree murder, a co-defendant, and multiple witnesses. However, one month before the Defendant's scheduled trial, the State requested a continuance in order to perform DNA testing on certain evidence and argued that the DNA evidence could possibly implicate the Defendant because the victim's car was found near the Defendant's mother's house and had been rummaged through. The State conceded that its delay in having the evidence tested was a result of "oversight." The State's acknowledged negligence weighs against the State, although to a lesser degree than that for an intentional delay. See Barker, 407 U.S. at 531.

### c. Assertion of the Right

The Tennessee and United States Supreme Court have both recognized that "an accused who is unaware that charges are pending against him or her, as is often the case where an indictment has been sealed and not served, cannot be penalized for his or her failure to assert the speedy trial right." State v. Wood, 924 S.W.2d 342, 351 n.13 (Tenn. 1996) (citing Doggett v. United States, 505 U.S. 647, 652-54 (1992)).

In this case, both parties agree that the Defendant asserted his right to a speedy trial. However, the Defendant was arrested for the victim's murder on July 18, 2012, and he did not assert his right to a speedy trial until June 30, 2014, more than twenty-three months after his arrest. In our view, the Defendant acquiesced in the delay by failing to assert his right to a speedy trial until over nineteen months after his arrest. Thus, this factor provides little weight in favor of the Defendant.

### d. Prejudice to the Defendant

We must now determine the extent of the prejudice suffered by the Defendant as a result of the delay. Of the four Barker factors, the most important factor is prejudice to the defendant, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." See State v. Vance, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994), overruled on other grounds by State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998). However, because it is impossible to prove the usefulness of a witness

- 12 -

who has disappeared or is unknown to the defense due to the delay, courts "do not necessarily require a defendant to affirmatively prove particularized prejudice." Doggett, 505 U.S. at 655. Furthermore,

> . . . [I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." . . . [E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria, it is part of the mix of relevant facts, and its importance increases with the length of the delay.

Id. (citations omitted). "[T]he presumption that delay has prejudiced the accused intensifies over time." State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001).

In this case, nothing in the record indicates that the defense was impaired by the delay of the start of the Defendant's trial. At the hearing on the motion to sever, the Defendant conceded that the continuance requested by the State did not affect his ability to present proof or call witnesses. Defense counsel agreed that the basis of his allegation of prejudice was the additional time he could spend in confinement given the time he had already spent in custody. However, the Defendant's incarceration during the pendency of these proceedings appears to have been due to a lengthy sentence he was serving in another case. Moreover, we cannot say that the delay was not so excessive that it presumptively compromised the reliability of the Defendant's trial. There was a delay of twenty-six months between the Defendant's arrest and his trial; however, "this period of delay is not necessarily unreasonable when compared to other cases." Simmons, 54 S.W.3d at 759 (delay of twenty-three months deemed "not necessarily unreasonable"). In our view, the delay in this case was not egregious, given the fact that the Defendant was charged with two counts of first degree murder and the Defendant did not assert his right to a speedy trial for over nineteen months.

Finally, the Defendant contends that the delay was prejudicial because he lost the opportunity to serve his new sentence concurrently with his former sentence. See State v. Wallace, 648 S.W.2d 264, 266 (Tenn. Crim. App. 1980). However, the issue of whether the Defendant should receive concurrent sentencing was before the trial court at sentencing because the Defendant was still serving his prior six-year sentence. Although he ultimately received consecutive sentencing—a decision he now challenges as part of this appeal—the Defendant was eligible for concurrent sentencing when sentenced and the trial court considered concurrent sentencing.

Our examination of the Barker factors establishes that the Defendant was not denied his right to a speedy trial. Consequently, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to sever defendants on this basis.

## 2. Fair Determination Concerns

The Defendant also contends that a severance of defendants was required during trial after the State decided to seek to admit only the portion of the victim's dying declaration that implicated the Defendant. He asserts that separate trials were necessary to achieve a fair determination of guilt or innocence of the Defendant. The State responds that the Defendant waived consideration of this issue by failing to move for a severance or to renew his prior severance motion.

During trial, the court conducted a jury-out hearing on the admissibility of the victim's statements to Mr. Rooks shortly after the shooting. Mr. Rooks testified that the victim made statements implicating both the person who shot him and the person who assisted the shooter. The following exchange occurred between the State and Mr. Rooks:

> Q: Was there any discussion about whether he had been fatally wounded or not? In other words, was there any talk from you or from him about whether he might die?
>
> A: No. He just said, he got me this time. And I was like, you done been shot before, we been through this before, everything is going to be all right. He kept trying to get up.
>
> Q: Was he able to get up?
>
> A: No, I wouldn't let him up.
>
> Q: When you said—when he said he got me this time, did he say anything else other than that?
>
> A: Yes, sir.
>
> Q: What else did he say?
>
> A: He said, Bull blocked me in.
>
> Q: Who is Bull?

- 14 -

A:      Antonio Crockett.

\* \* \*

Q:      Did [the victim] say anything else other than Bull blocked me in about the incident?

A:      Yes, sir.

Q:      What else did he say?

A:      The first thing he said was, he said, he got me, he got me. And I was like, who.  He said, the guy who tried to rob me, the same guy, he got me this time.  And I was like, who.  Then he said, he got me this time.  Then he said, Bull blocked me in, Bull blocked me in, get him.  I said, who.  He said, Bull blocked me in, get him.  By that time the ambulance people came, and they made me get away.  But that's all he said.

At the conclusion of the jury-out hearing, the trial court ruled that the victim's statement regarding the Defendant, *i.e.*, that "Bull blocked me in," was admissible under the dying declaration exception to the hearsay rule.  The State then announced that it would not seek to admit Mr. Rook's testimony that the victim also said, in reference to the person who shot him, "the guy who robbed me, the same guy, he got me this time." The trial court noted that that portion of the victim's statement would implicate Rule 404(b) of the Tennessee Rules of Evidence.  Following the jury-out hearing, Mr. Rooks testified that after the victim was shot, "*the only thing he said was*, [']Bull blocked me in.[']"  The Defendant contends that this comment left the impression that the victim implicated only the Defendant and not co-defendant Wilson.  However, at that time, the Defendant did not object, nor did he renew his motion for severance of defendants.

Tennessee Rule of Criminal Procedure 14(1)(A) provides that "[a] defendant's motion for severance of offenses or defendants shall be made before trial, except that a motion for severance may be made before or at the close of all evidence if based on a ground not previously known.  A defendant waives severance if the motion is not timely." Tenn. R. Crim. P. 14(1)(A).  As noted by the State, the Defendant did not move for a severance during trial nor did he renew his severance motion.  Accordingly, the Defendant waived our consideration of this claim. <u>See</u> Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

- 15 -

Although the Defendant has waived the issue, this court may notice an error as plain error under Rule 36(b) if the error affected the substantial rights of an accused and if notice of the error is necessary to do substantial justice. Tenn. R. App. P. 36(b). Plain error has been characterized as error that is obvious or egregious and has been "limited to those [errors] so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty or public reputation of the trial." United States v. Rodriguez, 882 F.2d 1059, 1064 (6th Cir. 1989).

In State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the accused must have been adversely affected; 4) the accused did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42. In State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the Adkisson test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection." Smith, 24 S.W.3d at 282-83. In applying the Adkisson test, the Smith court stated:

> We re-emphasize that the presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial."

Smith, 24 S.W.3d at 283 (quoting Adkisson, 899 S.W.2d at 642). In State v. Thomas, 158 S.W.3d 361 (Tenn. 2005), our supreme court stated that, ultimately, a trial error must have had "an unfair prejudicial impact which undermined the fundamental fairness of the trial." Thomas, 158 S.W.3d at 413 (citing Adkisson, 899 S.W.2d at 642).

Here, the Defendant has failed to show that a clear and unequivocal rule of law was breached. Tennessee Rule of Criminal Procedure 14(c)(2)(B) provides:

> On motion of the [S]tate or the defendant . . . the court shall grant a severance of defendants if . . . during trial, with consent of the defendants to

be severed, the court finds a severance necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c)(2)(B). Although the Defendant now contends that the victim's statement, "the guy who robbed me," was a reference to co-defendant Wilson, this was not clear from the evidence at the time this issue arose at trial, and there is no proof in the record that co-defendant Wilson would have consented to a severance at this point. In any event, we fail to see how the introduction of the victim's statement identifying co-defendant Wilson was necessary to achieve a fair determination of the guilt or innocence of the Defendant. In our view, the fact that the victim had also implicated co-defendant Wilson before his death would have bolstered and further corroborated the testimony of Mr. Anthony, who identified both co-defendant Wilson and the Defendant and testified that the Defendant blocked in the victim and prevented the victim's escape. Moreover, the statement would not diminish the fact that the victim had specifically identified the Defendant and described his role in the offense. For these reasons, we cannot conclude that the trial court's failure to order a severance of defendants after Mr. Rook's testimony was a violation of a clear and unequivocal rule of law. Accordingly, the Defendant is not entitled to plain error relief.

## B. Sufficiency of the Evidence

The Defendant next contends that the evidence was insufficient to support his conviction for first degree felony murder in perpetration of or attempt to perpetrate theft. The Defendant asserts that the State presented no evidence that he planned, directed, or encouraged the shooting of the victim and theft of the victim's vehicle and that, apart from his presence at the scene of the shooting, there was no evidence that he associated himself with the gunman's venture, acted with knowledge that the gunman would shoot the victim and take his vehicle, or shared in the gunman's intent. The State responds that the evidence is sufficient to support the conviction. We agree with the State.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft . . . [.]" Tenn. Code Ann. § 39-13-202(a)(2) (2012). A conviction for felony murder requires no culpable mental state "except the intent to commit the enumerated offenses." Tenn. Code Ann. § 39-13-202(b) (2012). The intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim, and whether such intent existed is a question of fact to be decided by the jury. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2012).

The jury in this case was instructed on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2012). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2012). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. State v. Maxey,

- 18 -

898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). Mere presence during the commission of a crime is insufficient to support a conviction. State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). However, the State need not show that the defendant physically took part in the crime, "encouragement of the principal is sufficient." Id.

When viewed in the light most favorable to the State, the evidence shows that the Defendant was actively involved in the shooting and theft from the victim. The Defendant drove the gunman to the scene of the crime. After passing the victim's BMW SUV, the Defendant made a U-turn and let the gunman out of his car. As the armed man approached the passenger side of the victim's vehicle, the Defendant positioned his car next to the driver's side of the victim's SUV, thereby preventing the victim from driving away and limiting the victim's ability to escape through his car door. The gunman yelled at the victim to open the door, hit the car window with the gun, and then fired at the victim—all while the Defendant continued to block the victim's car. Witnesses testified that the victim attempted to drive away and collided with the Defendant's car. The victim then had to "squeeze" out of his car door to flee the gunman. Once the gunman had control of the victim's SUV, the Defendant left the scene, and the gunman followed him. The pair drove off in the same direction, taking the same route, and the victim's SUV was later found abandoned near the Defendant's mother's residence. Officers testified that the victim's car had been ransacked, and it appeared that things had been taken from the car. After the shooting, the victim told Mr. Rooks that the Defendant was involved in the offense. Additionally, before the Defendant met with detectives, the Defendant wiped down the inside of his car with a cloth. During his interview, the Defendant told detectives that he was merely parked on the street calling a girl at the time of the shooting. However, Detective Crumby's review of the Defendant's call history showed that no calls were placed to or from the Defendant's phone during the time immediately before or after the shooting.

From these facts, the jury could reasonably find that the Defendant was guilty of felony murder under a theory of criminal responsibility. The proof established that the Defendant was an active participant in the events resulting in the victim's death and not merely present before and after the offense. The Defendant assisted in the commission of the offense by purposefully blocking the victim's car so that the victim could not escape the gunman. This issue is without merit.

### C. Dying Declaration

The Defendant contends that the trial court erred in admitting the victim's statement, "Bull blocked me in," under the dying declaration exception to the hearsay rule. He argues that the victim's statement did not qualify as a statement made under

belief of impending death under Rule 804(b)(2) of the Tennessee Rules of Evidence because the facts do not support an inference that the victim believed his death was imminent when the statement was made. The State maintains that the record supports the trial court's determination that the victim believed his death was impending at the time he identified the Defendant as the person who blocked in his vehicle and that the trial court properly admitted the statement. We agree with the State.

In the middle of Ms. Patterson's testimony, the trial court conducted a jury-out hearing regarding the introduction of statements made by the victim after he was shot. Ms. Patterson testified that, after the victim collapsed to the ground, blood was "pouring out" of the victim and had covered his entire shirt. She stated that the victim was rolling on the ground in "a lot of pain"; he was sweating heavily; and he had trouble breathing. Ms. Patterson further stated that the victim could talk and was aware of what had happened. When Mr. Rooks bent over the victim, Ms. Patterson heard Mr. Rooks ask, "Who did this to you, man?" However, she did not personally hear the victim's response.

Mr. Rooks testified that, after learning that the victim had been shot and robbed, he ran through an alley to Davis Boulevard where the victim was lying in the grass. Mr. Rooks stated that he held the victim's head in his arms and asked the victim where he had been shot. The victim responded by hollering that "it hurt, it hurt, it hurt." The victim had blood on his shirt, and Mr. Rooks saw that the victim was having trouble breathing. Mr. Rooks tried to reassure the victim by reminding him that the victim had previously survived gunshot wounds. However, the victim insisted, "[H]e got me this time." The victim told Mr. Rooks, "Bull blocked me in, Bull blocked me in, get him." Mr. Rooks stated that the victim began screaming and saying, "[I]t's burning." On cross-examination, Mr. Rooks acknowledged that he had told detectives that the victim could "talk good" when they asked if the victim was able to speak. Without objection from the State, the Defendant proffered a sentence found in Detective Crumby's case report that "the victim was alert in the ambulance and talking to paramedics and family on the way to the hospital." The Defendant also proffered that the call to 911 was placed at 12:56 p.m. and that the victim was pronounced dead at 1:37 p.m.

The trial court found that the victim's statement, "Bull blocked me in," was admissible under the dying declaration exception to the hearsay rule based upon all of the proof admitted at trial to that point. The trial court noted that a statement is admissible under the dying declaration exception even if the declarant does not expressly state that he believes his death is imminent and explained that the declarant's awareness of impending death can be inferred from the circumstances. The trial court cited the victim's "shallow breathing, the amount of blood, his fiancée telling him she loved him, [and] he was saying he loved her." The trial court noted that Ms. Patterson said that the victim was in a lot of pain and by the time she got to him, blood was "just pouring out."

Additionally, Mr. Rooks testified that the victim was hollering and screaming that "it hurt" and, when Mr. Rooks turned the victim over, he saw blood and that the victim was having difficulty breathing.

Our supreme court recently explained that the appellate standard of review for rulings on hearsay evidence has multiple layers:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d at 760-61. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is inadmissible unless the statement falls under one of the exceptions to the hearsay rule found in Tennessee Rules of Evidence 803 and 804. See Tenn. R. Evid. 802. In this case, Mr. Rooks' testimony about the victim's out-of-court statement that the Defendant had blocked him in was hearsay. However, the trial court admitted the victim's statement under the dying declaration exception found in Rule 804(b)(2), which provides that if the declarant is unavailable, the following is not excluded by the hearsay rule:

> In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death.

Tenn. R. Evid. 804(b)(2) (2014). This exception is rooted in the traditional notion that, as death looms near, the incentive to speak truthfully inevitably overwhelms any motivation to lie. See State v. Lewis, 235 S.W.3d 136, 148-49 (Tenn. 2007).

In the context of a criminal prosecution, the dying declaration exception to the rule against hearsay has five elements:

> (1) the declarant must be dead at the time of the trial;
>
> (2) the statement is admissible only in the prosecution of a criminal homicide;[7]
>
> (3) the declarant must be the victim of the homicide;[8]
>
> (4) the statement must concern the cause or the circumstances of the death; and
>
> (5) the declarant must have made the statement under the belief that death was imminent.

Lewis, 235 S.W.3d at 149 (citing Neil P. Cohen et al., Tennessee Law of Evidence § 8.35[2][b]-[f] at 8-156 (5th ed. 2005)).

The Defendant's challenge on appeal addresses the final element—that the declarant must have made the statement under the belief that death was imminent. As recognized by the trial court, "[I]t is not necessary that the declarant have stated unequivocally his belief that his situation is hopeless." State v. Branam, 604 S.W.2d 892, 895 (Tenn. Crim. App. 1980). "Awareness of impending death may be inferred from the facts and circumstances, the language and condition of the declarant, and the seriousness of the wounds." Id. Our supreme court has stated that "our cases attach much importance to the character of the wound; and that where the wound is obviously of a desperate nature the wounded man can scarcely contemplate it with any expectation of life." Crawford v. State, 273 S.W.2d 689, 691 (Tenn. 1954). Additional circumstances that this court has found significant in determining awareness of impending death include

---

[7] Rule 804(b)(2) was amended in 2009 to allow for the admission of a dying declaration in civil actions or proceedings.

[8] The 2009 amendment of the rule allows for an exception where the declarant is not the victim of the homicide being prosecuted but was nonetheless the victim of a homicide, such as where there are multiple victims but the prosecutions have been severed. See Tenn. R. Evid. 804(b)(2), Advisory Comm'n Cmts.

difficulty breathing, a frantic or frightened demeanor, fading in and out of consciousness, and final expressions of love to a romantic partner. See State v. David Smith, No. W2009-02002-CCA-R3-CD, 2010 WL 2482326, at *7 (Tenn. Crim. App. June 17, 2010), perm. app. denied (Tenn. Nov. 10, 2010).

In this case, although the victim never made an express statement that he knew he was about to die, the circumstances as summarized by the trial court support a finding that the victim was aware of his impending death. Multiple witnesses that had been with the victim following the shooting testified as to the victim's grave condition. The victim was bleeding profusely, sweating heavily, and screaming that he was in pain, and he had difficulty breathing. Photographs of the scene where the victim collapsed depict several blood-soaked towels used to stanch the bleeding, the victim's bloody shirt, and a large area of blood on the ground. In addition to the photographs and eyewitness testimony concerning the extent of the victim's injuries, the words the victim exchanged with those gathered around him support a conclusion that he was aware his death was imminent. The victim told Ms. Keeler that he loved her, and Ms. Keeler's description of their exchange suggests that they viewed their declarations of love as final. Mr. Rooks described how he cradled the victim's head in his arms and tried to comfort the victim by reminding the victim he had previously survived a gunshot wound. However, the victim responded, "He got me this time," and he complained to Mr. Rooks about the severity of the pain he was experiencing. The victim also told Mr. Rooks that the Defendant had been involved and asked Mr. Rooks to "get" the Defendant. Under these circumstances, we conclude that the trial court properly admitted the victim's out-of-court statement under the dying declaration exception to the hearsay rule. The Defendant is not entitled to relief.

## D. Consecutive Sentencing

Finally, the Defendant asserts that the trial court erred in ordering him to serve his life sentence consecutively to his prior six-year sentence because the trial court's ruling fails to satisfy the requirements of State v. Wilkerson, . The Defendant also argues that, even if he meets the statutory criteria for consecutive sentences, an aggregate sentence of life imprisonment plus six years is greater than that deserved for the offense committed and is not the least severe measure necessary to achieve the purposes for which the sentence is imposed. The State responds that the trial court acted within its discretion in ordering consecutive sentences.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682,

707 (Tenn. 2012).  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"  State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the potential for rehabilitation and treatment.  See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001); State v. Ashby, 823 S.W.2d 166, 168-69 (Tenn. Crim. App. 1991).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen.  Tenn. Code Ann. § 40-35-210(e) (2014); Bise, 380 S.W.3d at 706.  However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]."  Bise, 380 S.W.3d at 705-06.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  Tenn. Code Ann. § 40-35-401 (2014), Sentencing Comm'n Cmts.

In State v. Pollard, the Tennessee Supreme Court expanded its holding in Bise to trial courts' decisions regarding consecutive sentencing.  State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013).  In the cases where the trial court orders consecutive sentences, the record must reflect at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b).  Id. at 861.  Specifically, consecutive sentences may be ordered if the trial court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person . . . ;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2014). Any single ground is sufficient to support the imposition of consecutive sentencing. Pollard, 432 S.W.3d at 862. As long as the reasons for ordering consecutive sentences are properly articulated, this court will apply an abuse of discretion standard with a presumption of reasonableness on review. Id.

When the trial court relies upon the dangerous offender classification to impose consecutive sentences, the trial court must also consider whether the evidence has established that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). When the record fails to establish whether the trial court considered the Wilkerson factors, this court may either "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Pollard, 432 S.W.3d at 863.

In this case, the trial court imposed consecutive sentences based upon two of the discretionary consecutive sentencing grounds—that the Defendant is an offender whose record of criminal activity is extensive and that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The record clearly supports that trial court's findings with regard to the Defendant's extensive record of criminal activity. The Defendant's prior record spans thirteen pages of the presentence report, beginning when the Defendant was eighteen years old and continuing up to the offense in case number 2012-D-2860, which the Defendant committed at age thirty-three. The Defendant's prior convictions included at least seven prior felony offenses and seventy misdemeanor offenses.

Based upon the Defendant's record of criminal convictions, we conclude that the trial court acted within its discretion in ordering consecutive sentences. In his brief, the

Defendant concedes that his extensive criminal history alone is sufficient to support the trial court's imposition of consecutive sentences. Nonetheless, he challenges the trial court's finding that he is a dangerous offender, arguing that the trial court failed to properly consider whether the aggregate sentence is necessary in order to protect the public from further criminal acts under <u>Wilkerson</u>. Our review of the record indicates that the trial court considered both factors under <u>Wilkerson</u> and specifically stated that it was "necessary to protect the public from further serious criminal conduct by the [D]efendant[.]" The trial court noted the loss of life in this case and the Defendant's continued violent behavior once incarcerated. We conclude that the record supports the trial court's application of the <u>Wilkerson</u> factors, and the trial court did not abuse its discretion.

We appreciate the Defendant's alternative argument that an additional sentence of six years "serves no legitimate purpose" because he will be incarcerated at least into his eighties on his life sentence. Nevertheless, we are unable to say that the trial court abused its discretion in imposing consecutive sentences in this case. The trial court thoroughly examined the Defendant's criminal history and the nature of the offense and placed its reasons for ordering consecutive sentences on the record. Further, the record reflects that the trial court considered the principles and purposes of sentencing and found that the aggregate length of the sentences was reasonably related to the seriousness of the offense. The Defendant is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE